# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

4 electronic devices recovered during the arrest of Cory L. Griffin and currently in evidence at the Federal Bureau of Investigation

Case No. 18-m-63

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:
- ■ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ■ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), 846

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Special Agent Jeffrey Baker, FBI
Printed Name and Title

Sworn to before me and signed in my presence:

Date: May 7, 2018

_____
Judge's signature

City and State: Milwaukee, Wisconsin

Honorable David E. Jones, U.S. Magistrate Judge
Printed Name and Title

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Jeffrey A Baker, being first duly sworn, hereby depose and state as follows:

I. **BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent for the Federal Bureau of Investigation (FBI). I have been assigned to the Southeastern Wisconsin Regional Gang Task Force since October of 2017. As part of my duties as an FBI Special Agent, I investigate criminal violations relating to narcotics trafficking offenses and firearms offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963 and Title 18, United States Code, Section 924(c). I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

3. I have received training in the area of narcotics investigations, violent crime investigations, financial investigations, and various methods, which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in multiple investigations involving violations of narcotics laws.

4. I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized from narcotics trafficking, monetary instruments and various assets that were purchased with the proceeds of the drug trafficking.

5. This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

6. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

# IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8. The property to be searched is:

a. A black ZTE flip phone, model number Z353VL, serial number 320166281220, IMEI number 990006830136643 (Device A), recovered during the arrest of Cory L Griffin on March 20, 2018, and currently in evidence at the Federal Bureau of Investigation, 3600 South Lake Drive, Saint Francis, Wisconsin 53235.

b. A black U.S. Cellular LG flip phone, model number UN170PP, serial number 711CQTB015895, (Device B) recovered during the arrest of Cory L Griffin on March 20, 2018, and currently in evidence at the Federal Bureau of Investigation, 3600 South Lake Drive, Saint Francis, Wisconsin 53235.

c. Samsung flip phone, grey in color, model number SCH-U680, FCC id number A3LSCHU680 (Device C), serial number is currently unknown recovered during the arrest of Cory L Griffin on March 20, 2018, and currently in evidence at the Federal Bureau of Investigation, 3600 South Lake Drive, Saint Francis, Wisconsin 53235.

d. A black/silver Apple iPhone, IMEI number is 359255062593865, serial number (Device D) is presently unknown recovered during the arrest of Cory L Griffin on March 20, 2018, and currently in evidence at the Federal Bureau of Investigation, 3600 South Lake Drive, Saint Francis, Wisconsin 53235.

## II. PROBABLE CAUSE

9. During the investigation of a drug trafficking organization led by Kavanaugh C. COLEMAN (hereinafter the COLEMAN DTO), case agents identified Cory L. Griffin as a heroin distributor. On October 18, 2016, a FBI Confidential Source (CS-1) informed investigators that he had recently observed COLEMAN and Cory L. Griffin together in a vehicle. CS-1 stated Griffin had just been released from prison and Griffin had caught a case in Chicago when he was stopped with a half a kilogram of cocaine. CS-1 stated that, at that time, Griffin was staying in a halfway house.

10. For several reasons, case agents believe that CS-1 is reliable and credible. First, CS-1 has been providing continuous information since May of 2016. Second, the information CS-1 has provided is substantially against CS-1's penal interest. Third, the information provided by CS-1 is consistent with evidence obtained elsewhere in this investigation where CS-1 was not utilized, and substantial portions of CS-1's information has been corroborated through independent investigation, including surveillance and information from other sources. For example, CS-1 stated that s/he contacted COLEMAN using (414) 519-1818 to purchase heroin, which was corroborated by toll records and information from other sources. Fourth, CS-1 has made statements to case agents that are against his/her penal interests, in that CS-1 has admitted his/her involvement in the COLEMANDTO's activities in the past. Finally, CS-1 has had an adequate opportunity to observe directly the events discussed and/or has heard conversations directly from the individuals discussed herein. CS-1 has prior convictions for Possession of THC, Possession with Intent to Deliver Cocaine, Fleeing/Eluding an Officer, and Receiving Stolen Property. CS-1 is currently on probation/parole status for his/her conviction of Possession with Intent to Deliver Cocaine. CS-1 is cooperating in exchange for financial benefits. To date, CS-1 has received $850.00 in exchange for his/her cooperation on this investigation. CS-1 has provided law enforcement with timely and accurate information corroborated by law enforcement through consensually recorded conversations, controlled buys, and other witness and law enforcement reporting. In November of 2016, case agents observed CS-1's vehicle during a controlled buy of heroin from Coleman. Case agents suspected that CS-1 delivered heroin to a drug customer on

behalf of COLEMAN and this activity was not under the direction and control of law enforcement. Case agents subsequently approached CS-1 to inquire whether s/he had engaged in this unauthorized criminal activity and CS-1 admitted to engaging in unauthorized criminal activity. Since that time, CS-1 has continued to provide intelligence regarding the COLEMANDTO to case agents and case agents continue to believe that the information provided by CS-1 about the COLEMANDTO is truthful and reliable because it has been corroborated through independent investigation.

11. During the week of March 20, 2017, case agents observed a gray Chrysler Pacifica bearing WI license plate 801-VMF parked in front of 3050 N. Richard Street, Milwaukee, Wisconsin, which is one of Coleman's stash houses. Case agents observed COLEMAN exit the residence and briefly enter his black Infiniti M35 bearing WI license plate MV4612. COLEMAN then entered the passenger seat of the gray Chrysler Pacifica. COLEMAN exited the Pacifica a few minutes later and returned to the residence. Case agents followed the Pacifica from this location to the south side of Milwaukee; however, due to heavy traffic in the area, case agents were unable to continue surveillance.

12. On March 25, 2017, case agents observed the same gray Chrysler Pacifica bearing WI license plate 801-VMF parked in the lot of Economy Auto, 6630 N. 91st Street, Milwaukee, Wisconsin, a location where COLEMAN and other members of his DTO conduct narcotics transactions. Case agents observed the driver of the Pacifica briefly

interact with Joshua L. Brown, a known member of the COLEMAN DTO, through the passenger side window to the vehicle.

13. On March 27, 2017, a gray Chrysler Pacifica bearing WI license plate 801-VMF was stopped by MPD for registration violations at 2330 W. Orchard Street. According to the officers that conducted the stop, GRIFFIN was driving the vehicle at the time of the stop. Griffin told officers he did not have a telephone number.

14. Case agents obtained a Title III wire intercept order in the COLEMAN investigation and intercepted multiple telephone conversations between COLEMAN and Griffin regarding drug trafficking. For example, on May 13, 2017 at 9:16 p.m., COLEMAN received an incoming call from 414-315-1471 and spoke to GRIFFIN. GRIFFIN tells COLEMAN he is just really getting back out and he just went back to a location, "broke something down, and then got back out there." GRIFFIN tells COLEMAN that "Gucci's cousin" is acting like he is ready so GRIFFIN is going to try him out. GRIFFIN then tells COLEMAN that this individual is always pulling up on him asking for "a four" and that yesterday GRIFFIN told him why would you want to buy four when you could sell 20 or 30 balls (a ball is 3.5 grams of cocaine) a day for me. GRIFFIN tells COLEMAN he told this individual that if you buy four what kind of profit are you going to see when you hold it for three days or something. GRIFFIN tells COLEMAN that he is going to go ahead and take a road trip tomorrow morning because he just got the call today from "Cuz." COLEMAN asks GRIFFIN what time he is getting out of here and GRIFFIN tells COLEMAN as soon as he wakes up. GRIFFIN tells COLEMAN he might wait until Monday to ride with rush hour. COLEMAN tells GRIFFIN that is how he likes to do it.

COLEMAN asks GRIFFIN what he has going. GRIFFIN tells COLEMAN probably three or four sheets (three or four kilograms). At the time, based upon their training and experience, case agents believed that "sheets" was code for kilograms of cocaine.

15. Later in the conversation, COLEMAN tells GRIFFIN he is probably going start off with at least a deuce (meaning two kilograms) and says a lot of it is already pre-sold and people are just waiting on him. COLEMAN tells GRIFFIN that he needs a little sheet (one kilogram of cocaine) for his people. COLEMAN tells GRIFFIN make sure you don't leave my cash here. GRIFFIN tells COLEMAN that he isn't going to leave any cash around. COLEMAN tells GRIFFIN he needs to make a great impression when GRIFFIN goes to see "Cuz." GRIFFIN tells COLEMAN that "Cuz" pretty much started it off and started "Stu" off with a hundred (100 grams of cocaine) and watched him go to two thousand (two kilograms of cocaine) in about two months. Based upon my review of the preliminary transcript of the call, my training and experience, and the investigation to date, case agents believe GRIFFIN is planning on purchasing three to four kilograms of cocaine from "Cuz" on Monday, May 15, 2017.

16. On May 14, 2017 at 1:14 p.m., COLEMAN received an incoming call from GRIFFIN and during the call, COLEMAN asks GRIFFIN what time he is heading out tomorrow. GRIFFIN tells COLEMAN he is going to go at 11 o'clock. GRIFFIN tells COLEMAN "There for going ain't no risky man coming back...." COLEMAN tells GRIFFIN "I was going to say that's how I always bring it back rush hour, ain't in no rush to get back." GRIFFIN tells COLEMAN "blend right in man, just a working man in a working van." GRIFFIN tells COLEMAN "if I was to just throw on my hard hat man,

and uh, construction site." GRIFFIN tells COLEMAN that he doesn't even have anywhere to do this because his sister is home. COLEMAN tells GRIFFIN he can use a new "lab" COLEMAN has in the area of 40th and Capital. GRIFFIN tells COLEMAN "Man I go to court in a month, this shit crazy as a bitch man." Based upon case agents' review of the preliminary transcript of the call, training and experience, case agents believed GRIFFIN was planning on traveling to an unspecified location on Monday, May 15, 2017 to pick up three or four kilograms of cocaine. COLEMAN offered GRIFFIN a place to break down the cocaine at a residence in the area of N. 40th Street and W. Capital Drive.

17. At the time, GRIFFIN was on supervised release for a prior federal conviction for violation of Title 21, United States Code, Section 841(a)(1), possession with intent to distribute 500 grams or more of cocaine from the Northern District of Illinois. On May 11, 2017, case agents spoke with GRIFFIN's supervising probation officer in the Eastern District of Wisconsin who stated that GRIFFIN had provided 414-315-1471 as his contact number to U.S. Probation.

18. On May 15, 2017, case agents initiated surveillance at GRIFFIN's residence located at 2464 W. Galena Ave, Milwaukee, Wisconsin. At approximately 1:30 p.m., case agents observed GRIFFIN, who was wearing a white t-shirt and blue jeans, depart the Galena Ave address driving a 2017 dark blue Chrysler Pacifica Minivan bearing Wisconsin license plate 377-XZU. A black female was riding in the passenger seat. According to Wisconsin DMV records, this vehicle is registered to EAN Holdings which case agents know to be Enterprise Rental Car. Case agents followed the vehicle GRIFFIN

was driving to a Family Dollar Store and a Gas Station on North Ave where GRIFFIN made short stops. GRIFFIN then headed east on North Avenue and headed south on I-43. Case agents observed GRIFFIN continue on I-43 South, I-94 East, I-294 West, I-90 West and eventually parked in the parking lot of a Portillo's Hot Dogs located at 170 W. North Ave, Northlake, Illinois at approximately 3:50 p.m.

19. At approximately 4:10 p.m., case agents observed a Dodge Challenger bearing Illinois license plate Z904284 parked approximately four spaces away from GRIFFIN. According to Illinois DMV records, this vehicle is registered to Arthur G. Smith and Jeannette Gallegos, 108 N. Marilyn, Northlake, Illinois. A black male exited the Challenger approximately three minutes later and approached the passenger window of the Pacifica. Case agents observed a brief interaction between the occupants of the Pacifica and the black male. The black male then returned to the Challenger and entered the driver's seat. At approximately 4:14 p.m., GRIFFIN departed the area and began driving back towards Milwaukee the same way he had come. Case agents continued both ground and air surveillance of GRIFFIN's vehicle during the entire trip back. GRIFFIN did not make any stops or interact with any other vehicles during this time.

20. At approximately 5:30 p.m., Wisconsin State Patrol Troopers initiated a traffic stop of GRIFFIN's vehicle on I-94 West just south of the Drexel Road exit. GRIFFEN immediately pulled over when the stop was initiated. Troopers removed GRIFFIN and the black female from the vehicle. The State Trooper then utilized a K-9 that circled the vehicle and alerted at various points of the vehicle. During a cursory search of the vehicle, which occurred, State Troopers observed in plain view,

approximately $10,000 in cash in two bundles wrapped in rubber bands. Additionally, one of the bundles of cash was sealed inside a plastic baggie. Troopers observed loose bits of marijuana throughout the vehicle and as well as the end of a marijuana cigarette in the vehicle. Troopers continued a cursory search the vehicle and no other contraband was located. The vehicle was seized and maintained in FBI custody.

21. On May 16, 2017, case agents obtained a federal search warrant for the dark blue 2017 Chrysler Pacifica with vehicle identification number (VIN) 2C4RC1BG5HR741552 bearing Wisconsin license plate 377-XZU, that GRIFFIN had been surveilled in and stopped in on May 15, 2017. Case agents searched the vehicle on May 16, 2017 and the search two sheets of compressed heroin weighing approximately 230.7 grams with packaging which had been concealed inside of a Portillos bag that was on the floor in the front passenger area of the vehicle.

22. On March 15, 2018, Milwaukee Police Department officers obtained a state search warrant for 1417 W. Greenfield Avenue upper unit to search for evidence of heroin trafficking. The targets of the search warrant were Tyriana C. Owens and Cory L. Griffin. At the time the search warrant was executed, Cory L. Griffin was not at the residence; however, an individual located at the residence at the time the search warrant was executed identified Griffin, who goes by "C," as a heroin dealer. On March 16, 2018, the Honorable Nancy Joseph signed a federal criminal complaint and arrest warrant for Cory Griffin for violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B) and 846.

23. On March 20, 2018, at 4:20 a.m., MPD officer observed a black infinity SUV with Wisconsin license plate number 326-UVX parked in the alley of 3200 Block of North Richards Street, completely blocking the alley. MPD Officers walked up to the vehicle, which was unoccupied at the time, and observed a bottle of alcohol in the center counsel. The officers then walked back to their squad when they heard movement in the yard. The officers observed a black male enter the driver's side of the vehicle. The black infinity SUV with license plate 326-UVX drove southbound in the alley. MPD Officers conducted a traffic stop at 329 East Auer Street. The driver of the vehicle was identified as, Cory L Griffin (DOB 03/31/1981). Griffin stated that he was picking up his girlfriend. A wanted check revealed the above-described arrest warrant. Recovered from Griffin's person and his vehicle at the time of his arrest were the four cellular telephones listed in paragraph 8, and further described in Attachment A.

24. The Devices referenced in Paragraph 8 are currently in storage at the Federal Bureau of Investigation. In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state, as they were when the Devices first came into the possession of the Milwaukee Police Department.

## TECHNICAL TERMS

25. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. *Wireless telephone*: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of

transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. *Digital camera*: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals.

When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. *Tablet*: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "Wi-Fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

26. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications I know that Device D has capabilities that allows it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of these types can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been

viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

28. There is probable cause to believe that things that were once stored on Devices A through D, may still be stored there, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

   d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

29. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that

establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

   a. Data on the storage mediums can provide evidence of a file that was once on the storage mediums but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage mediums that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

30. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

31. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in paragraph 8.

## ATTACHMENT A

The property to be searched is:

a. A black ZTE flip phone, model number Z353VL, serial number 320166281220, IMEI number 990006830136643 (Device A), recovered during the arrest of Cory L Griffin on March 20, 2018, and currently in evidence at the Federal Bureau of Investigation, 3600 South Lake Drive, Saint Francis, Wisconsin 53235.

b. A black U.S. Cellular LG flip phone, model number UN170PP, serial number 711CQTB015895, (Device B) recovered during the arrest of Cory L Griffin on March 20, 2018, and currently in evidence at the Federal Bureau of Investigation, 3600 South Lake Drive, Saint Francis, Wisconsin 53235.

c. Samsung flip phone, grey in color, model number SCH-U680, FCC id number A3LSCHU680 (Device C), serial number is currently unknown recovered during the arrest of Cory L Griffin on March 20, 2018, and currently in evidence at the Federal Bureau of Investigation, 3600 South Lake Drive, Saint Francis, Wisconsin 53235.

d. A black/silver Apple iPhone, IMEI number is 359255062593865, serial number (Device D) is presently unknown recovered during the arrest of Cory L Griffin on March 20, 2018, and currently in evidence at the Federal Bureau of Investigation, 3600 South Lake Drive, Saint Francis, Wisconsin 53235.

# ATTACHMENT B

1.  All records on the Devices described in Attachment A that relate to violations of Title 21, United States Code, Section 841(a)(1) and 846:

    a.  Electronic drug or money ledgers, drug distribution or customer lists and related identifying information, drug supplier lists (including names, addresses, phone numbers, or any other identifying information); correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed lists of customers and related identifying information; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    b.  Electronic telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, e-mails, documents, and other items or lists reflecting names, addresses, telephone numbers, addresses, and any communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

    c.  Records, items and documents stored on the Devices reflecting travel for the purpose of participating in drug trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel from August 2012 to the present;

    d.  Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, UPS, FedEx, and other mail service receipts and records, bank statements, checks, credit card records, safe deposit box records, records and receipts and rental agreements for storage facilities, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances.

e. Photographs, videotapes or other depictions of assets, co-conspirators, controlled substances, or other activities related to drug trafficking or money laundering.

   f. Records of Internet Protocol addresses used; records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user typed web addresses.

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.